SECOND DIVISION

No. 1-09-1476

| | | |
|---|---|---|
| RENATE OELZE, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| SCORE SPORTS VENTURE, LLC d/b/a Score | ) | Honorable |
| Tennis and Fitness Center, | ) | Kathy M. Flanagan, |
| | ) | Judge Presiding. |
| Defendant-Appellee. | | |

JUSTICE KARNEZIS delivered the opinion of the court:

Plaintiff Renate Oelze filed an action alleging negligence and willful and wanton misconduct against defendant ABRIA, INC., d/b/a Score Tennis & Fitness Center[1] for injuries she sustained while playing tennis at defendant's tennis club. Plaintiff had previously signed a membership agreement containing a statement releasing defendant from liability for any injuries plaintiff might sustain when using defendant's equipment and facilities. The court dismissed plaintiff's negligence count and granted summary judgment to defendant on plaintiff's willful and wanton misconduct count. On

---

[1] Plaintiff incorrectly sued defendant as "Score Sports Venture, LLC, d/b/a Score Tennis & Fitness Center." ABRIA, d/b/a Score Tennis & Fitness Center, answered the complaint.

appeal, plaintiff asserts the court erred in (1) dismissing her negligence claim because (a) she did not voluntarily waive her right to sue defendant for negligence when she signed the release and, alternatively, (b) her injury was caused by a circumstance that did not ordinarily accompany the game of tennis and was, therefore, not covered by the release; (2) granting summary judgment to defendant on the willful and wanton count because there exists a question of fact regarding whether defendant exhibited a conscious disregard for the safety of its patrons; and (3) finding that defendant's responses to plaintiff's request to admit were proper. We affirm in part, reverse in part and remand.

Background

Defendant is the owner and operator of an indoor tennis club. Plaintiff has been a member of the tennis club for over 10 years. On October 5, 2005, a club employee presented her with a "Players Club Membership Agreement" covering her membership for the upcoming tennis season. She had signed similar agreements in previous years. The agreement included a statement under which plaintiff released defendant "from any and all liability for any damage or injury" plaintiff might receive while using defendant's equipment and facilities and assumed all risk for claims rising from the use of the equipment and facilities. Plaintiff signed the agreement.

On February 10, 2006, plaintiff was playing a tennis match on defendant's tennis court 5. Defendant's courts are separated from an access/service walkway by a heavy, black, floor-to-ceiling curtain at the back of each court. Players access the courts from

the walkway and defendant stores equipment in the walkway. Returning a lob during her match, plaintiff ran to the back of the court and ran into the curtain trying to return the shot. Her effort pushed the curtain back slightly and she caught her foot in a rope exercise ladder lying behind the curtain. Plaintiff fell, fracturing her elbow and tearing her rotator cuff. The ladder was not visible from the court before the accident. Only after the accident, when a witness to the accident pushed the curtain back, was the ladder visible.

Plaintiff filed suit for negligence, asserting defendant was negligent in placing the ladder or allowing it to remain on the floor behind the curtain where it could not be seen from the court knowing that it would be a tripping hazard to anyone playing tennis on the court. Defendant moved to dismiss pursuant to section 2-619(a)(9) of the Illinois Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2008)). It asserted that plaintiff, by signing the membership agreement containing the release clause, voluntarily waived liability on behalf of defendant.

Plaintiff responded by asserting she did not voluntarily waive liability on behalf of defendant. By affidavit and deposition, she stated that she chose to make automatic payments for her membership dues and signed the form thinking that it was an authorization form for the automatic deductions from her credit card. When presented with the form, she asked the club employee who presented the form to her what it was and was told it was an authorization form for the automatic payments. Plaintiff saw that the $135 monthly fee was correct and signed the form on the only signature line. She

3

did not see that the form contained a release.

Plaintiff stated in a deposition that she played at the club three or four times a week and, besides using the courts, regularly used the treadmills and weights available in the workout area of the club. Walking through the access walkways, she always saw a "a lot of stuff" behind the curtains, such as tennis carts, padded concrete pillars, an equipment box and loose tennis balls. It was her habit, as she walked through the access walkway, to kick errant tennis balls from the middle of the walkway to the side, close to the curtain, so she would not step on the balls as she walked. She had walked through the walkway on the way to her match the morning of the accident but did not see the ladder. During the match, plaintiff had run to the back of the court to return a shot, and "got stuck with [her] foot" in the curtain. She thought she had gotten caught in a hole in the curtain but saw the culprit was a rope ladder when someone lifted the curtain to see what had trapped her. She had not known the ladder was there.

Plaintiff testified it was unavoidable that a player would come in contact with the curtain at some point when chasing a deep ball but that you cannot get hurt hitting the curtain. Only if something that should not be there is too close behind the curtain, such as a cart with balls, could one get hurt. The player's goal is not, however, to hit the curtain with her body, because then the player could not get to the ball anyway. The curtains are heavy and give a little when touched. Only if a player ran "really hard to it," with all of her force, would a curtain give more.

Connie Stinek and Mary Gallagher testified by deposition that they witnessed

4

plaintiff's accident. Stinek, the tennis director for another club, pushed the curtain back after the accident and saw the rope ladder. When she was leaving the court, she saw "other teaching equipment, teaching carts, you know, other cones and those kinds of things there" in the walkway. Stinek remembered thinking when she saw the equipment, "oh boy, that is not real safe." The equipment, including the ladder, appeared tennis specific and was all equipment used at her club as well. Her club had a separate area away from the walkway for such equipment. Gallagher testified she saw plaintiff go back against the curtain when she reached to hit the ball to return a lob. She saw the curtain push back when plaintiff made contact, plaintiff's foot get caught in "some kind of netting," which was "right by the backdrop or right behind it," and plaintiff go down.

Jeff Schuetz, the club tennis pro supervising plaintiff's match, testified in his deposition that players could run a few inches or feet into the dividing curtains while playing on the courts. He stated the walkways should, therefore, be kept clear of equipment and other tripping hazards. One of his responsibilities, as it was for all the club teaching and fitness staff, was to keep the floors clear of any tripping hazards. He had taught the cardio-fitness class which used the equipment Stinek saw in the walkway, including the ladder, but did not remember whether he had used the ladder in class that morning. It was Schuetz's responsibility to retrieve the equipment and put it away after the fitness class. None of the equipment should have been on the floor behind the curtain. It was kept in a large green equipment storage box kept two feet

from the back of the curtains. Although Schuetz typically put the fitness equipment away after class, sometimes class members did the cleanup. He did not recall who performed the cleanup that morning. He did not see the ladder prior to the accident. It was Schuetz's practice to walk through the walkway every morning and pick up stray balls and anything that needed cleaning up. He walked through the walkway that morning and did not see the rope ladder. Had he seen it on the floor, he would have picked it up and put it away.

Lisa Paolella, the club's general manager, testified by deposition that the ladder was used in fitness training sessions at the club. She stated everyone in the class will help bring the equipment out before class and put it back after class, "a group effort," but the trainer or pro leading the class makes sure the equipment is put back. The ladder is to be used only for supervising training sessions but anyone at the club has access to it. Paolella testified she and all the teaching and fitness pros at the club have responsibility for the maintenance and pick up of the facility to keep the floor free of hazards. She stated "we don't allow debris to remain on the tennis court" because it would be unsafe. She found it "likely" that anyone running into the curtain would cause it to move back "a few inches." She found moving the curtain back "a few feet is hardly likely."

Paolella testified the club does not store equipment up against the curtain "in case someone does fall into the curtain." It would not be safe. She stated that, for the safety of the tennis players, the area right behind the curtain must be free of objects.

6

She stated if she was walking through the walkway and saw the ladder on the floor behind the curtain she would pick it up and her employees were trained to do the same. On the morning before plaintiff's match, the walkway would have been cleaned by the club's maintenance person. He cleaned the walkways three days a week. Cleaning involved picking up any stray balls and rackets, placing the carts where they were supposed to be and sweeping and mopping the floors. It was part of the maintenance person's job to pick up a fitness ladder if he saw it on the floor, and from her experience with the man, he would have done so. Paolella testified Schueltz would have walked the walkway prior to the match to make sure there was nothing on the floor and have picked up anything in the walkway and behind the curtain.

Paolella testified the ladder was normally kept in an equipment box located behind court 5. The box had been there for years and contained medicine balls, free weights and small weights, besides the ladder. The carts with balls were to be kept behind the metal beams in the hallway, away from the curtains, so that someone did not crash into a cart. There had not been any previous accidents involving training equipment on the floor behind a curtain.

Plaintiff moved for leave to file a first amended complaint in order to add a count for willful and wanton misconduct. She alleged defendant, with superior knowledge of the equipment placed in its facility, exhibited a conscious indifference to the safety of others by placing the ladder, which is unrelated to the game of tennis and unlikely to be anticipated by a tennis payer, in a concealed area, creating a tripping hazard trap or by

7

allowing it to be so placed.

On September 26, 2007, the court granted plaintiff leave to file her first amended complaint but dismissed plaintiff's negligence claim with prejudice, finding the waiver clear, enforceable and properly procured by defendant and the injury foreseeable.

On May 8, 2009, the court granted summary judgment to defendant on the willful and wanton misconduct count, finding no evidence to show defendant knew the ladder was on the ground behind the curtain or that it posed a danger or had a conscious disregard or utter indifference to the safety of others. The court denied plaintiff's "motion to deem admitted" her request to admit the validity and necessity of her medical expenses. Plaintiff had asserted that defendant's response to her request to admit was deficient because it did not set forth a good-faith detailed reason why certain requests could not be admitted. The court found that the question of the sufficiency of defendant's answers was moot given the court's grant of summary judgment to defendant but noted that it found defendant's answers to the request were proper. Plaintiff filed its timely notice of appeal from the court's orders on June 4, 2009.

Analysis

1. Dismissal of Negligence Count

a. Standard of Review

Plaintiff argues the court erred in dismissing her negligence count based on its finding that the release from liability plaintiff signed as part of her membership agreement was valid and enforceable and the danger posed by the ladder foreseeable.

8

Under section 2-619, a valid cause of action is presumed but barred by an affirmative matter, a defense which negates the plaintiff's cause of action. 735 ILCS 5/2-619(a)(9) (West 2008); *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17, 619 N.E.2d 732, 735 (1993). The defense or affirmative matter must be apparent on the face of the pleading attacked or be supported by affidavit. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367-68, 379, 799 N.E.2d 273, 278, 285 (2003). The existence of a valid release such as defendant claims here is an affirmative matter defeating plaintiff's claim. *Weisblatt v. Colky*, 265 Ill. App. 3d 622, 626-27, 637 N.E.2d 1198, 1201 (1994). There is no question that plaintiff signed the release contained in the membership agreement. Given the existence of a release, plaintiff, as the party opposing its use, has the burden of attacking its validity. *Weisblatt*, 265 Ill. App. 3d at 626, 637 N.E.2d at 1200. Interpreting all pleadings in the light most favorable to the nonmoving party, we must determine "whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law." *Kedzie & 103rd Currency Exchange, Inc.*, 156 Ill. 2d at 116-17, 619 N.E.2d at 735. We review a section 2-619 dismissal *de novo*. *Van Meter*, 207 Ill. 2d at 368, 799 N.E.2d at 278.

b. Involuntary Waiver

In Illinois, a party may contract to avoid liability for its own negligence. *Garrison v. Combined Fitness Centre, Ltd.*, 201 Ill. App. 3d 581, 584, 559 N.E.2d 187, 189

9

(1990). Barring fraud or willful and wanton negligence, such a release or exculpatory agreement is valid and enforceable "unless: (1) there is a substantial disparity in the bargaining position of the two parties; (2) to uphold the exculpatory clause would be violative of the public policy; or (3) there is something in the social relationship between the two parties that would militate against upholding the clause." *Garrison*, 201 Ill. App. 3d at 584, 559 N.E.2d at 189-90. Plaintiff does not assert the court erred in finding the release enforceable because there exists a disparity in the bargaining positions between defendant and herself or the clause violates public policy or the parties had a social relationship affecting the validity of the release. Instead, plaintiff argues dismissal of her negligence count was improper because the circumstances surrounding her execution of the agreement create a question of fact as to whether the release was fairly obtained or executed because she was misled into signing the release.

A release or exculpatory agreement can be set aside if there is either fraud in the execution or fraud in the inducement. *Bien v. Fox Meadow Farms Ltd.*, 215 Ill. App. 3d 337, 341, 574 N.E.2d 1311, 1315 (1991). Fraud in the execution occurs when the plaintiff was induced to sign the agreement not knowing it was a release, but believing it to be another type of document; fraud in the inducement occurs when the party is induced to enter into the release by false representations by the other party. *Bien*, 215 Ill. App. 3d at 342, 574 N.E.2d at 1315. However, a party has a general duty to read documents before she signs them, and her failure to do so will not render the document

invalid. *Bien*, 215 Ill. App. 3d at 342, 574 N.E.2d at 1315. We find no question of fact raised by the circumstances of plaintiff's signing of the release and the court could properly find the release enforceable.

Plaintiff asserts she was told by one of defendant's employees that the form was for authorization of payment of her membership dues, she was not told there was anything else contained on the form, and she did not know she was signing a release when she signed the agreement. In an affidavit, plaintiff stated that, when asked to sign the document, she asked what she was signing and was told it was an authorization form authorizing the club to take automatic payments from her account. Relying on that representation, she signed the form on its only signature line believing the form was as represented to her. She stated she did not read anything other than the amount of monthly dues to make sure that was correct, did not voluntarily believe she was signing a waiver for injury claims and "did not even think that the form authorizing such payments would include any contractual language unrelated to [her] financial accounts." We do not find, as plaintiff asserts, that a reasonable person could believe that the document plaintiff signed was a "financial document to simply authorize payments as defendant represented." It may well be that defendant's employee told plaintiff the form was a payment authorization form. This is entirely true. The form is, for the most part, concerned with the payment and/or refunding of membership dues and the possibility of additional charges. But it is more than just a simple authorization for automatic payments of plaintiff's membership dues and, had

11

plaintiff bothered to look at anything on the form beyond the fee amount, she would have seen this.

The release is incorporated into the membership agreement. That agreement consists of a single page, titled in large bold lettering "PLAYERS CLUB MEMBERSHIP AGREEMENT." There are then lines to be completed with the dollar amount of the membership dues, here shown to be $135 "monthly dues," followed by lines for the member's name, address and contact information. The next section of the form is titled, in much smaller font: "AUTHORIZATION FOR AUTOMATIC MONTHLY PAYMENTS." It consists of a paragraph titled "CREDIT CARD AUTHORIZATION" comprised of very small font delineating the details of the parties agreement regarding the automatic payments.

The next section on the form is titled, in the same size font as the previous title, "TERMS OF MEMBERSHIP." Under that title, in tiny font, is a paragraph detailing the member's rights and duties under the agreement, the nonrefunding of membership dues and lastly, in the final sentence, the following release:

> "I hereby release SCORE Tennis & Fitness and its owners and employees from any and all liability for any damage or injury, which I may receive while utilizing the equipment and facilities and assume all risk for claims rising from the use of said equipment and facilities."[2]

---

[2] The only copy of the membership agreement in the record is an extremely

1-09-1476

Below this is a section of boxed text, in larger font, regarding the length of the membership and possible additional charges. The box is followed by a signature line and a date line. Plaintiff signed and dated the form and wrote "same" for both her address and credit card information.

The titles "AUTHORIZATION FOR AUTOMATIC MONTHLY PAYMENTS" and "TERMS OF MEMBERSHIP" are in almost identical font size and clearly legible. The

---

blurry copy of a facsimile copy of the agreement. It is almost impossible to read the sections in the larger fonts, let alone the "terms of membership" section containing the release. The inclusion of a large-size font transcript of the "terms of membership," probably prepared by one of the parties so that the circuit court could read the language of the "terms of membership" section, is the only reason we are able to read this section. However, given that plaintiff does not assert the original form with which she was presented was illegible and that the larger font "authorization for monthly payments" section is almost as impossible to read as the "terms of membership section," we assume the illegibility of the form in the record is entirely due to the poor facsimile copy and the original was legible. In the absence of a sufficient record, we must resolve any doubts arising from the incompleteness of the record against the appellant and presume the trial court's actions conformed to the law and its rulings were supported by the evidence, or lack thereof. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392, 459 N.E.2d 958, 959 (1984).

13

"TERMS OF MEMBERSHIP" title is an obvious indication that there is more contained in the form than just a payment authorization. There is no question that, as plaintiff asserts, the font for the text in the "TERMS OF MEMBERSHIP" section encompassing the release is tiny, the smallest font in the agreement, and that, size-wise, the most space in the agreement is taken by the sections concerning the monthly dues, identification and credit card authorization information. There is also no question that the section containing the release is hard to read because of the size of the font. But plaintiff does not state that it is impossible to read. She does not assert that she failed to read it because it was so small or was illegible. She states she could have read it but did not because she thought the form was only about her financial obligations. Plaintiff asserts defendant's employee presented the agreement in the context of their discussion of payment for membership, that the form needed to be signed to authorize payment. She does not assert that the employee purposely misled her into thinking the agreement was only about her financial obligations, although this can be inferred. But even if the employee had misled her to this extent, plaintiff had a duty to read the agreement before she signed it. She did not read it. She was not prevented from reading it. It was her own decision not to read it. Had plaintiff read the agreement, she would have seen the release, which is legible and explicitly states in clear and common terms that plaintiff releases defendant from liability for injuries arising from and assumes all risk arising from the use of defendant's equipment and facilities. Her failure to read the release should not be held against defendant.

14

### c. Foreseeable Risk

Plaintiff also argues that a question of fact exists regarding whether the danger created by the ladder, which was unrelated to the game of tennis and hidden behind the curtain outside the court of play, is the kind of risk which would have been reasonably contemplated to fall within the release. A release, to be valid and enforceable, "should contain clear, explicit, and unequivocal language referencing the types of activities, circumstances, or situations that it encompasses and for which the plaintiff agrees to relieve the defendant from a duty of care." *Garrison*, 201 Ill. App. 3d at 585, 559 N.E.2d at 190. The release here is extremely broad, providing that plaintiff releases defendant from liability for injuries she sustains "while utilizing the equipment and facilities" and she assumes "all risk for claims rising from the use of said equipment and facilities." It is uncontested that plaintiff was playing on defendant's court, *i.e.,* using defendant's facilities, when she suffered her injury. Plaintiff does not assert that the language of the release is not clear. Therefore, plaintiff having agreed to assume the risk for her use of the club's "equipment and facilities," defendant is presumably not liable for plaintiff's injuries suffered during her use of its court facilities. Plaintiff asserts, however, that defendant is liable because the injury caused by the ladder was not within the scope of possible dangers covered by the release.

The foreseeability of a danger is an important element of the risk a party assumes and often defines the scope of an exculpatory release agreement. *Platt v.*

15

*Gateway International Motorsports Corp.*, 351 Ill. App. 3d 326, 331, 813 N.E.2d 279, 284 (2004). The plaintiff must be put on notice by the release of the range of dangers for which she assumes the risk of injury, enabling her to minimize the risks by exercising a greater degree of caution. *Platt*, 351 Ill. App. 3d at 331, 813 N.E.2d at 284; *Garrison*, 201 Ill. App. 3d at 585, 559 N.E.2d at 190. Although the precise occurrence which caused an injury need not have been contemplated by the parties when the release was signed, the injury must fall "within the scope of possible dangers" accompanying the activity and, thus, have been reasonably contemplated by the plaintiff and covered by the release. *Platt*, 351 Ill. App. 3d at 331, 813 N.E.2d at 284; *Garrison*, 201 Ill. App. 3d at 585, 559 N.E.2d at 190.

Plaintiff argues that the injury caused by the ladder was not within the scope of possible dangers covered by the release because the ladder was not a piece of equipment being used by her or by anyone else in her match and was unrelated to the game of tennis. She asserts, therefore, assuming *arguendo* that she did voluntarily sign the release, the injury was not something for which she could reasonably have assumed the risk. Defendant responds that the ladder may not have been used by plaintiff but it is used regularly by other club members and is, therefore, part of the club's equipment and facilities and thus covered by the release.

There is no question that the ladder is part of the club's equipment. Schuetz's testimony shows the ladder is used regularly in organized cardio-fitness classes at the

club. The question is whether plaintiff's tripping on this piece of equipment while playing tennis falls "within the scope of possible dangers" accompanying tennis and, thus, reasonably contemplated by the plaintiff

From her deposition, it is clear that plaintiff is an experienced tennis player and has played at the club several times a week for many years. She stated it is usual in a tennis match to run to the back of the court in order not to miss a return shot and, if necessary, into the curtain, and that the curtain would give into the walkway a little if touched. Plaintiff testified it was unavoidable that a player would come in contact with the curtain at some point when chasing a deep ball but that one cannot get hurt hitting the curtain. Only if something is too close behind the curtain that should not be there, such as a cart with balls, could one get hurt. Tennis pro Schuetz and club manager Paolella confirm this. Plaintiff stated she had walked through the club's access walkways many times and knew they contained equipment, pillars, carts and stray tennis balls behind that curtain.

It is clear from the evidence that any equipment on the walkway floor closely behind the curtain can be a hazard for a player running into the curtain. This is why the club endeavored to keep the walkway clear. Plaintiff could have reasonably presumed that, should she run into the curtain, she might step or trip on something behind the curtain. It is entirely foreseeable that, if plaintiff accidently ran into the curtain to return a shot or turned her foot under the curtain, she could trip over or be hurt by any club

17

equipment immediately behind the curtain, whether a cart or a ball or, as in this case, an exercise ladder. Granted, plaintiff had not used the ladder in her tennis match. But the ladder is part of the club's equipment and facilities. It is used in classes to make tennis players more fit. Fellow club-director Stinek's testimony shows a similar ladder is used at her tennis facility. All of the equipment behind the curtain is tennis-related. We find the ladder is encompassed by the "equipment" specified in the release and injury sustained from tripping on an exercise ladder is within the scope of possible dangers accompanying playing tennis at the club. The court did not err in finding the injury foreseeable and covered by the release.

2. Summary Judgment on Willful and Wanton Misconduct Count

Plaintiff argues the court erred in granting summary judgment to defendant on plaintiff's willful and wanton misconduct count because there is a question of fact regarding whether defendant exhibited a conscious disregard for the safety of others. A drastic means of disposing of litigation, a motion for summary judgment is granted only when, after construing the pleadings, depositions, admissions and affidavits on file strictly against the movant and liberally in favor of the opponent, the court finds no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Willett v. Cessna Aircraft Co.*, 366 Ill. App. 3d 360, 368, 851 N.E.2d 626, 633 (2006); *Purtill v. Hess*, 111 Ill. 2d 229, 240-41, 489 N.E.2d 867, 871 (1986). The purpose of summary judgment is not to try a question of fact but to determine

18

whether one exists. *Golden Rule Insurance Co. v. Schwartz*, 203 Ill. 2d 456, 462, 786 N.E.2d 1010, 1014 (2003). We review the trial court's entry of summary judgment *de novo*. *Golden Rule Insurance Co.*, 203 Ill. 2d at 462, 786 N.E.2d at 1014.

Willful and wanton acts show "actual or deliberate intent to harm" or, if not intentional, show "an utter indifference to or conscious disregard for a person's own safety or the safety or property of others." *Pfister v. Shusta*, 167 Ill. 2d 417, 421, 657 N.E.2d 1013, 1016 (1995). Plaintiff does not allege that defendant intentionally harmed her. Rather, plaintiff argues that genuine issues of material fact exist regarding whether defendant acted with conscious disregard for her well-being. A nonintentional willful or wanton act is committed under circumstances showing a reckless disregard for the safety of others such as, for example, when a party (a) fails, after knowledge of an impending danger, to exercise ordinary care to prevent the danger or (b) fails to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care. *American National Bank & Trust Co. v. City of Chicago*, 192 Ill. 2d 274, 285, 735 N.E.2d 551, 557 (2000). "More than mere inadvertence or momentary inattentiveness which may constitute ordinary negligence is necessary for an act to be classified as wilful and wanton misconduct." *Stamat v. Merry*, 78 Ill. App. 3d 445, 449, 397 N.E.2d 141, 145 (1979). The party doing the wanton act or failing to act "must be conscious of his conduct, and, though having no intent to injure, must be conscious, from his knowledge of the surrounding

19

circumstances and existing conditions, that his conduct will naturally and probably result in injury." *Bartolucci v. Falleti*, 382 Ill. 168, 174, 46 N.E.2d 980, 983 (1943). Whether conduct amounts to willful and wanton negligence is generally a question of fact for the jury to determine. *Canning v. Barton*, 264 Ill. App. 3d 952, 955, 637 N.E.2d 702, 704 (1994)

Plaintiff asserts defendant's conduct was willful and wanton because, with superior knowledge of the equipment placed in its facility, it exhibited a conscious indifference to the safety of others by placing the ladder, which is unrelated to the game of tennis and unlikely to be anticipated by a tennis payer, in a concealed area creating a tripping hazard trap or by allowing it to be placed there. There is no question that the club and its employees knew that placing an object on the floor closely behind a court curtain, hidden from the view of tennis players using the court, creates a dangerous hidden tripping hazard. There is also no question that the ladder was part of the equipment defendant uses in its fitness classes, was only to be used under the supervision of one of defendant's employees, may have been used in the fitness class held on court 5 immediately prior to plaintiff's match and is usually placed in or on top of the equipment box stored in the walkway behind the curtain. There is no question defendant's employee Schuetz led the fitness class that morning, regularly used the ladder in his fitness classes, may have used the ladder in class that morning, was responsible for putting the equipment away, ordinarily would have put the

equipment away and did not know who put the equipment away that morning.

Plaintiff asserts the above creates a question of fact regarding whether defendant showed a conscious indifference in its actions by (a) continually storing the equipment in a place it knew posed a hidden tripping hazard and/or (b) its pro Schuetz's specific actions in putting/placing/throwing the rope ladder in the dangerous area or allowing it to drop on the ground in the dangerous area given his knowledge of the latent danger generally existing. We agree.

It is clear that defendant and its employees were very conscious of the danger caused by objects on the floor of the walkway closely behind the curtain. Defendant knew a tennis player may run a few inches into the curtain, although rarely more. Defendant endeavored to eliminate the danger caused by an object closely behind the curtain by trying to avoid having any object closer than two feet from the curtain, having the walkways cleaned three times per week, instructing its employees to keep the walkways clear and to pick up any stray objects and put them away where they belonged. In the case of the ladder, defendant stored it in or on top of the equipment box two feet from the curtain.

But the ladder was found on the floor right behind the curtain. There is nothing to show how the ladder came to be on the floor near the curtain, whether it fell there or was tossed there, who caused it to be placed there, when such placement happened or whether one of defendant's employees saw it there and neglected to pick it up.

21

Sometime between the time the fitness class ended and the time plaintiff caught her foot in the ladder, the ladder appeared on the floor where everyone agrees it should not have been. One can, therefore, infer that defendant's efforts to safeguard the hallway failed. There is no question defendant attempted to keep its walkways and courts safe for its members. But there is a question of fact regarding whether defendant's efforts to prevent the danger caused by the errant ladder failed due to inadvertence or due to a reckless disregard for the safety of others. That question, of whether plaintiff's injury was the result of defendant's failure to exercise ordinary care to discover the ladder and prevent the danger it posed or merely of defendant's inattentiveness, is for the trier of fact to decide. The court erred in granting summary judgment to defendant on the willful and wanton count.

### 3. Motion to Deem Admitted

Plaintiff lastly argues the court erred in denying her motion to deem admitted her request to admit. Plaintiff had served on defendant a request to admit pursuant to Supreme Court Rule 216 (134 Ill. 2d R. 216), asking defendant to admit that plaintiff incurred particular medical expenses as a result of the accident, that the expenses were for reasonable and necessary treatments and the expenses were reasonable and fair charges. She attached a summary of her medical bills and a copy of each bill. On behalf of defendant, Paolella responded to each itemized request by stating that, having "made reasonable inquiry and the information known or readily available within

22

the Defendant's control [being] insufficient to admit or deny," and not being a physician or nurse, having no training in medical billing and practice rates or treatments described in plaintiff's bills reasonable and necessary medical diagnosis, care or treatment,she could not admit or deny the request to admit. Plaintiff filed a "motion to deem admitted" her request to admit, asserting that defendant's responses were deficient because it did not set forth a good faith detailed reason why certain requests could not be admitted. The court denied the plaintiff's motion, finding that, although the question was moot given the court's grant of summary judgment to defendant, defendant's answers to the request were proper.

Rule 216 provides that "[a] party may serve on any other party a written request for the admission by the latter of the truth of any specified relevant fact set forth in the request." 134 Ill. 2d R. 216(a). The necessity and reasonableness of the medical services a plaintiff received to treat her injuries and the reasonable cost of those medical services are facts that are proper subjects for a Rule 216 request to admit. *Szczeblewski v. Gossett*, 342 Ill. App. 3d 344, 348, 795 N.E.2d 368, 371 (2003). Rule 216 provides:

> "Admission in the Absence of Denial. Each of the matters of fact and the
> genuineness of each document of which admission is requested is admitted
> unless, within 28 days of service thereof, the party to whom the request is
> directed serves upon the party requesting the admission *** a sworn statement

23

denying specifically the matters of which admission is requested or setting forth in detail the reasons why he cannot truthfully admit or deny those matters." 134 Ill. 2d R. 216(c).

The statute was not designed to shift the burden of proof on to a defendant but rather to save the time and expense of litigation by eliminating the necessity of proof regarding facts within the knowledge of the party upon whom the request is made. *Szczeblewski*, 342 Ill. App. 3d at 349, 795 N.E.2d at 371. To that end, Rule 216 provides that "a party has a good-faith obligation to make a reasonable effort to secure answers to requests to admit from persons or documents within the responding party's reasonable control," including from the party's attorney and insurance company investigators or representatives. *Szczeblewski*, 342 Ill. App. 3d at 349, 795 N.E.2d at 372. However, Rule 216 also provides that a responding party may, in lieu of answering all or part of the request, serve "written objections on the ground that some or all of the requested admissions are privileged or irrelevant or that the request is otherwise improper." 134 Ill.2d R. 216(c); *Brookbank v. Olson*, 389 Ill. App. 3d 683, 688, 907 N.E.2d 426, 430 (2009). If the proper framework of Rule 216 is not followed, an incontrovertible judicial admission results and the fact is withdrawn from contention. *Brookbank*, 389 Ill. App. 3d at 687, 907 N.E.2d at 429-430.

Defendant's responses to plaintiff's requests to admit were boilerplate responses. Granted, defendant's answers follow verbatim the following language,

24

quoted in context, from *Szczeblewski*,

"In deciding a party's duty under Rule 216, we are guided by how Supreme Court Rule 213 (166 Ill. 2d R. 213) ('Written Interrogatories to Parties') has been construed. Rule 213 has been interpreted 'to require a party to answer fully and in good faith to the extent of his actual knowledge and the information available to him or to his attorney.' [Citations.] Comparably, Rule 36 of the Federal Rules of Civil Procedure (Fed. R. Civ. P. 36(a)) ('Request for Admission') explicitly requires as follows: 'An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless the party states that the party *has made reasonable inquiry and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny.*' " (Emphasis added.) *Szczeblewski*, 342 Ill. App. 3d at 349, 795 N.E.2d at 372.

However, it is clear that, in answering a request to admit, a party is not just supposed to make a formulaic assertion quoting the above language. It is not supposed to state an answer lacking any detail of the extent of the "reasonable inquiry" it asserts that it made or why the "information known and readily obtainable" by it was insufficient to enable it to admit or deny the requests. The responding party must explain why its resources are lacking to such an the extent that it cannot answer the requests. Defendant did not do so. Accordingly, its failure to answer in detail results in admission of the requested

25

facts.

Defendant asserts plaintiff's request to admit was insufficient in that she did not attach supporting materials showing that the treatments for which she was billed were necessary and/or reasonable or how the treatments related to her injury and its responses were, therefore, adequate. Plaintiff had previously submitted her medical records to defendant. So defendant knew what her injuries were and, with its access to its insurance company and the insurer's databases of claims and necessary treatments and expenses, could make a pretty good guess at the reasonableness of the expenses and treatments claimed and contest those, if necessary. Further, if defendant considered plaintiff's requests to admit to be inadequate, defendant should have filed a written objection to those requests. It chose not to do so. The court erred in denying plaintiff's motion to deem the facts admitted.

## Conclusion

For the reasons stated above, we affirm the decision of the circuit court dismissing plaintiff's negligence count, reverse the court's grant of summary judgment to defendant on plaintiff's willful and wanton count and reverse the court's denial of plaintiff's motion to deem admitted.

Affirmed in part, reversed in part and remanded.

CUNNINGHAM, P.J., and THEIS, J., concur.

1-09-1476

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each case)

RENATE OELZE,

      Plaintiff-Appellant,

v.

SCORE SPORTS VENTURE, LLC d/b/a Score Tennis and Fitness Center,

      Defendant-Appellee.

No. 1-09-1476

Appellate Court of Illinois
First District, Second Division

March 30, 2010

JUSTICE KARNEZIS delivered the opinion of the court.

CUNNINGHAM, P.J., and THEIS, J., concur.

Appeal from the Circuit Court of Cook County.

The Honorable Kathy M. Flanagan, Judge Presiding.

For APPELLANT: Law Office of Christ S. Stacey, of Chicago (Christ S. Stacey, of counsel)

For APPELLEE: Pretzel & Stouffer, Chartered, of Chicago (Robert Marc Chemers, David M. Bennett and Thomas E. Daugherty, of counsel)

27