# Illinois Official Reports

## Appellate Court

---

### *Empress Casino Joliet Corp. v. W.E. O'Neil Construction Co.*,
### 2016 IL App (1st) 151166

---

| | |
|---|---|
| Appellate Court Caption | EMPRESS CASINO JOLIET CORPORATION, Plaintiff-Appellant, v. W.E. O'NEIL CONSTRUCTION COMPANY, an Illinois Corporation, LINDEN GROUP, INC., an Illinois Corporation, R.L. MILLIES & ASSOCIATES, INC., an Indiana Corporation, GLOBAL FIRE PROTECTION COMPANY, an Illinois Corporation, JAMESON SHEET METAL, INC., an Illinois Corporation, and AVERUS, INC., f/k/a FACILITEC CENTRAL, INC., a Wisconsin Corporation, Defendants-Appellees.—NATIONAL FIRE AND MARINE INSURANCE COMPANY, a Nebraska Corporation, LLOYD'S SYNDICATE 1414 (Ascot), a British Underwriting Syndicate, and AXIS INSURANCE COMPANY, an Illinois Corporation, as Subrogees of Empress Casino Joliet Corporation, an Illinois Corporation, Plaintiffs-Appellants, v. W.E. O'NEIL CONSTRUCTION COMPANY, an Illinois Corporation, LINDEN GROUP, INC., an Illinois Corporation, R.L. MILLIES & ASSOCIATES, INC., an Indiana Corporation, GLOBAL FIRE PROTECTION COMPANY, an Illinois Corporation, JAMESON SHEET METAL, INC., an Illinois Corporation, and AVERUS, INC., f/k/a FACILITEC CENTRAL, INC., a Wisconsin Corporation, Defendants-Appellees. |
| District & No. | First District, Third Division<br>Docket Nos. 1-15-1166, 1-15-1184 |
| Filed | November 16, 2016 |
| Rehearing denied | December 21, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 2012-L-012077, 2014-L-003223; the Hon. John P. Callahan, Jr., Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed in part; reversed and remanded in part. |
| | |
| Counsel on Appeal | Mark A. Rabinowitz and Kevin P. Caraher, of Cozen O'Connor, PC, and David E. Walker and Douglas Walker, of Walker Wilcox Matousek LLP, both of Chicago, for appellants Empress Casino Joliet Corp., National Fire and Marine Insurance Co., and Lloyd's Syndicate 1414 (Ascot). |
| | Randy Green, of Dugan Brinkmann, Maginnis & Pace, and Thomas A. McDonald, of McDonald Law Firm, both of Chicago, for appellant Axis Insurance Co. |
| | Robert J. Franco and Christopher M. Cano, of Franco & Moroney, LLC, of Chicago, for appellee W.E. O'Neil Construction Co. |
| | Robert Marc Chemers, Richard M. Waris, and Donald Patrick Eckler, of Pretzel & Stouffer, Chtrd., of Chicago, for appellee Jameson Sheet Metal, Inc. |
| | William P. Pistorious and Mark J. Sobczak, of Clausen Miller, of Chicago, for appellee Global Fire Protection Co. |
| | Ryan T. Johnson and Clare J. Quish, of Schuyler, Roche & Crisham, P.C., of Chicago, for appellee Linden Group, Inc. |
| | Dan L. Boho and Steven R. Swofford, both of Hinshaw & Culbertson, LLP, of Chicago, for appellee Averus, Inc. |
| | James W. Ozog and David J. O'Connell, of Golberg Segalla LLP, of Chicago, for appellee R.L. Millies & Associates, Inc. |
| | |
| Panel | PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.<br>Justices Lavin and Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1    This cause of action arises from a fire that occurred during an extensive renovation project, at Empress Casino Joliet (hereinafter the casino) on March 20, 2009. As a result of the fire, the casino, which is owned by the insured plaintiff, Empress Casino Joliet Corporation (hereinafter Empress), sustained extensive damages. Empress received $81,150,000 in insurance payments from three separate insurers—Axis Insurance Company (hereinafter Axis), National Fire and Marine Insurance Company (hereinafter National Fire), and Lloyd's Syndicate 1414 (Ascot) (hereinafter Lloyd's)—under three separate insurance policies. The Axis policy was a "builder's risk" policy specific to the renovation project, while the National Fire and Lloyd's policies provided general property coverage for the casino. At issue in this appeal are the subrogation rights of the three insurers.

¶ 2    Specifically, in this appeal Empress and the three insurers appeal the trial court's grant of summary judgment against them in two underlying consolidated actions against numerous defendants that they claim were responsible for the fire. The first cause of action (case No. 2012 L 012077) was filed by Empress against W.E. O'Neil Construction Co. (hereinafter W.E. O'Neil), Global Fire Protection Company (hereinafter Global), Jameson Sheet Metal Inc. (hereinafter Jameson), the Linden Group, Inc. (hereinafter Linden), R. L. Millies & Associates, Inc. (hereinafter Millies), and Averus, Inc. (hereinafter Averus), and asserted claims for $83,700,000 in damages to cover: (1) the $2,550,000 deductibles that Empress incurred as a result of the fire and (2) the $81,150,000 in payments that the three insurers made for Empress's covered losses and for which they should have been subrogated. The second action (case No. 2014 L 003223) was filed by the three insurers (Axis, National Fire, and Lloyd's) against the same defendants and asserted their subrogation claims. Both actions alleged claims of negligence and willful and wanton misconduct against all of the defendants, and claims for breach of contract against all of the defendants, except for Averus.

¶ 3    After the two cases were consolidated, the circuit court granted summary judgment in favor of all the defendants, on all claims, holding that a waiver of subrogation clause contained in the construction contract for the casino renovation project prevented all the plaintiffs from asserting their respective subrogation claims. The plaintiffs now appeal.

¶ 4    On appeal, all of the plaintiffs (Empress, Axis, National Fire, and Lloyd's) argue that the trial court erred when it found that the waiver of subrogation clause in the renovation construction contract applied to the defendant, Averus, since Averus operated under a separate pre-existing oral contract and was not involved in the renovation project. All of the plaintiffs also assert that the trial court erred when it found that the waiver of subrogation clause prevented them from proceeding with their willful and wanton misconduct claims because public policy should bar enforcement of such exculpatory clauses where heighted misconduct is alleged.

¶ 5    In addition, Empress, National Fire, and Lloyd's argue that the waiver of subrogation clause is limited to Axis's builders risk policy and does not apply to Empress's general property insurance policies with National Fire and Lloyd's. In the alternative, Empress, National Fire, and Lloyd's argue that to the extent that waiver of subrogation might apply, it is limited to those losses related to the work (*i.e.*, the renovation project), as it is defined in the construction contract. In addition, Empress, National Fire, and Lloyd's argue that the defendants' material breaches of the construction contract should bar enforcement of the

waiver of subrogation clause. Finally, Empress asserts that it never waived its right to recover its deductibles under its general property insurance policies with National Fire and Lloyd's. For the reasons that follow, we affirm in part and reverse in part.

## I. BACKGROUND

The record below us is voluminous. For purposes of clarity, we will set forth only those facts and procedural history relevant for this appeal.

### A. The Parties

In 2008, Empress, which owned and operated the casino complex located in Joliet, Illinois, began performing extensive renovations to its property. For this purpose, Empress entered into a construction contract with O'Neil as the general contractor. O'Neil then hired, *inter alia*, subcontractors Jameson (for HVAC and sheet metal work) and Global (for sprinkler installment). Linden was the architect and Millies the mechanical, electrical, and plumbing engineer (responsible for *inter alia*, the fire sprinkler and mechanical systems) for the renovation project. The parties do not dispute that prior to the renovation project, Empress had entered into a separate contract with Averus for Averus periodically to perform cleaning and maintenance services at the casino, including the cleaning and removal of cooking grease and other combustible residue from ductwork in and above the kitchen. Averus continued to perform these services for Empress during the renovation project.

### B. The Renovation Project Construction Contract

The parties agree that on September 15, 2008, Empress entered into a construction contract with O'Neil for the renovation project. That contract was comprised of, *inter alia*: (1) the American Institute of Architects (AIA) Standard Form of Agreement Between Owner and Contractor (AIA Document A111-1997) and (2) the General Conditions of the Contract for Construction (AIA A21-1997) (hereinafter the construction contract). Relevant to the issues in this appeal, as to insurance coverage, the construction contract required Empress as the "Owner" to maintain both liability (section 11.2) and property (section 11.4) insurance. With respect to property insurance section 11.4 provides in pertinent part:

> "§ 11.4.1 Unless otherwise provided, the Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance written on a builder's risk 'all-risk' or equivalent policy form in the amount of the initial GMP, plus value of subsequent Contract modifications and cost of material supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Section 9.10 or until no person or entity other than the Owner has an insurable interest in the property required by this Section 11.4 to be covered, whichever is later. This insurance shall include interest of the Owner, the Contractor, Subcontractors, and Sub-subcontractors in the Project."

¶ 12    Section 11.4.1.1 further provides that the property insurance shall be on "an 'all risk' or equivalent policy form and must include, "without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage, including *** [*inter alia*], theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup." The property insurance also must cover "reasonable compensation" for services and expenses incurred by the architect and contractor "as a result of such insured loss."

¶ 13    Section 11.4.1.2 further explicitly provides that if the owner chooses not to purchase property insurance, the owner must inform the contractor in writing of such a decision before the work begins so that the contractor may obtain such insurance and protect its interest (as well as the interests of the subcontractors and sub-subcontractors) in the work, as well as increase the price tag on the renovation project, to cover the cost of having to obtaining such insurance itself.

¶ 14    The contract also allocates who will be responsible for payment of deductibles after the property insurance is obtained. Section 11.4.1.3 explicitly states that "If the property insurance requires deductibles, the Owner shall pay costs not covered because of such deductibles."

¶ 15    In addition, the contract contains an explicit waiver of subrogation clause. Specifically, sections 11.4.5 and 11.4.7 state in pertinent part:

"§ 11.4.5 If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project, or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, Owner shall waive all rights in accordance with the terms of Section 11.4.7 for damages caused by fire or other causes of loss covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

* * *

§ 11.4.7 Waiver of Subrogation. The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, Architect's consultants, separate contractors described in Article 6, if any and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.4 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-contractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damage."

¶ 16    Article 6 referenced above is titled "Construction By Owner or by Separate Contractors." Section 6.1 of that article, states in pertinent part:

"[T]he Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these including those portions related to insurance and waiver of subrogation."

In addition, section 6.1.2 of that article provides that "[w]hen separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term 'Contractor' in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement." Finally, section 6.1.4 states that:

"when the Owner performs *** operations related to the Project with the Owner's own forces, the Owner shall be deemed to be subject to the same obligations and to have the same rights which apply to the Contractor under the Conditions of the Contract, including without excluding others, those stated in [*inter alia*] Article[ ] *** 11 ***."

¶ 17                           C. Empress's Insurance Policies

¶ 18    At the time of the fire, Empress had in place three insurance policies. Specifically, for purposes of the renovation project, Empress purchased a "builder's risk policy" from Axis. This policy was in effect from December 22, 2008, to December 22, 2009. The Axis policy provided coverage for "direct physical 'loss' to Covered Property caused by or resulting from any of the Covered Causes of Loss." Under the policy "Covered Property" was defined as, *inter alia*, "[b]uildings or structures (including foundations, underground flues, pipes or drains) while under construction, erection or fabrication at the project site shown in the Coverage Form Declarations." The Axis policy contained explicit language indicating that Axis (as the insurer) "may waive [its] rights against another party in writing" prior to a loss to covered property.

¶ 19    In addition to the Axis policy, at the time of the incident, Empress also had in place two general "all-risk" property insurance policies for the casino with National Fire and Lloyd's. Both policies were in effect for the period between August 8, 2007, and December 31, 2010. National Fire was responsible for 90% of the property coverage, and Lloyd's for 10%. The parties do not dispute that Lloyd's policy incorporates by reference the wording of the National Fire policy so that the language of the two policies is essentially the same. Specifically, the policies "insure[ ] against all risk of direct physical loss or damage to property insured by this policy occurring during the policy period except as hereinafter excluded." The policies define "property" as "real or personal property," including," *inter alia*, "improvements and betterments"; "property in the care, custody or control of the Insured or for which the Insured is legally liable to insure"; "property of the Insured in the care, custody or control of others"; "property while in the incidental course of construction, installation, erection or assembly"; "demolition and increased cost of construction"; and "debris removal."

¶ 20    The policies further provided that "[u]nder no circumstances shall insurer be liable for cover, nor drop down in the event of erosion of aggregate for the following," *inter alia*, "*Property in the Course of Construction* (except for incidental Course of Construction) being property in due course of construction, renovation, erection, installation, or assembly."

"Incidental Course of Construction" is separately defined in National Fire's policy as "total contracted works costs of $10,000,000 or lower."

¶ 21 In addition, both National Fire and Lloyd's policies contain a "Subrogation" provision, which states in relevant part that they as "[t]he Insurer[s] will not acquire any rights of recovery that the Insured has expressly waived prior to loss, nor will such waiver affect the Insured's rights under the Policy."

## D. The Fire and the Complaints

¶ 22

¶ 23 On March 20, 2009, during the first phase of the renovation project, large portions of the casino were destroyed by a fire. After Empress received $81,150,000 in insurance proceeds from Axis, National Fire, and Lloyd's,[1] on October 23, 2012, it filed a complaint against the defendants to recoup damages for itself and for its insurers, resulting from the fire (case No. 2012 L 012077).

¶ 24 According to Empress's complaint, the fire was started when a Jameson employee, Mike Haberzetle, was welding ductwork in the kitchen area. Haberzetle was attaching new ductwork to the existing duct for the kitchen hood exhaust and started welding the existing ductwork even though the duct was coated with grease and other residue from cooking. During the welding the existing duct ignited on the inside, causing extensive damage to the casino complex. In a written statement, which is part of the record on appeal, Haberzetle described the incident as follows:

> "I was welding in the new kitchen area attaching new duct to the existing [duct] for the kitchen hood exhaust. The existing duct started on fire on the inside. I took the lift down to the ground, went for the fire extinguisher, [but] it was not on the pole for it. So I went to get another and tell Lance [the foreman] about it. When I got back to put it out, it was out of control and we called the fire department."

¶ 25 In its complaint, Empress further alleged that during the welding operations, O'Neil and Jameson both failed to provide the necessary fire watch required as protection during hot work. Specifically, Empress complained that O'Neil and Jameson did not have a fire extinguisher near Haberzetle and permitted or participated in the decision to allow the welding to occur when fire sprinklers in other areas of the casino were out of operation. In addition, Empress alleged that O'Neil and Jameson failed to maintain the required clearance between the welding operations and combustibles.

¶ 26 Empress also alleged that the architect, Linden, and the mechanical engineer, Millies, failed to provide for sprinklers in the concealed attic/truss spaces above the kitchen as required by the building code. Similarly, Empress alleged that the sprinkler subcontractor, Global, had installed the non-compliant sprinkler system.

¶ 27 As to Averus, Empress alleged that four months prior to the incident, Averus purportedly spent five hours performing cleaning services at the casino and submitted a written report to Empress stating that it had spent this time cleaning the "kitchen hot line" and certifying that the "ductwork [was] clean." Nonetheless, according to the complaint, the ductwork in the kitchen was coated with grease.

---

[1]According to the insurers' complaint, National Fire paid $64,215,000, Lloyd's paid $7,135,000, and Axis paid $9,800,000 to Empress for the fire damage.

¶ 28    Accordingly, Empress alleged that as a result of the defendants' negligence, and willful and wanton misconduct, the fire resulted in $83,695,000 in damages. Accordingly, Empress sought $81,150,000 for the insurers and the remainder to cover Empress's deductibles.

¶ 29    The three insurers—Axis, National Fire, and Lloyd's—subsequently filed a direct subrogation suit against the defendants, seeking to recover the same damages as those in the Empress lawsuit (case No. 2014 L 003223). The allegations in the insurers' complaint were identical to those in Empress's complaint. These two cases were later consolidated. Empress subsequently amended its complaint and added breach of contract claims against all the defendants, except for Averus.

¶ 30                                    E. Discovery

¶ 31    The parties proceeded with discovery, during which the following relevant deposition testimony was obtained.

¶ 32    Norman Nelms, Empress's vice president for design and construction, testified, *inter alia*, that the casino renovation project was budgeted at $50 million and involved both the renovation of the land and vessel portion of the casino. Nelms stated that Empress hired Linden as project architect to develop the renovation design and that Linden in turn hired Millies as mechanical engineer.

¶ 33    In his deposition, Nelms acknowledged that after the design was discussed but before the project began, he was aware of certain problems with the fire safety of the casino. Specifically, Nelms knew that the dry pipe system in the casino's pavilion was unable to hold pressure effectively and was therefore compromised. Nelms did not know if the area above the kitchen duct in the pavilion was sprinklered. He stated, however, that he was aware that the pavilion area had a functional wet system (sprinklers) in case of fire. He explained that the wet system covered all of the "below ceiling" spaces in the pavilion and the dry system covered all of the spaces in the pavilion above the ceiling (*i.e.*, the attic space). Nelms also testified that the casino engaged in fire watches but did not know details as to how these were conducted.

¶ 34    Nelms next explained that, during the renovation project, the responsibility for the safety of the job site fell to the general contractor, O'Neil, who had control of the job site. Nelms explained that this responsibility was accorded to O'Neil by way of (1) the construction project (2) O'Neil's own safety program and (3) industry custom and practice. Nelms averred that since renovation always involved some aspects of demolition, there would necessarily be times when the sprinkler system would have to be out of commission. Therefore, there were special safety considerations for the project for which O'Neil was responsible, including anything related to protecting customers, the building, and the workers during the renovation. Nelms explained that Empress's role in terms of safety would have been to collaborate with O'Neil.

¶ 35    During his deposition, Nelms was shown a Site Assessment Report for February 11, 2009 (about a month before the fire), which states that if any element of the fire protection system has to come down due to renovation activities, Empress's casino security guards would perform fire watch walks in those areas. Nelms averred that this report evidenced the "collaboration" that was required between O'Neil and Empress during the renovation. He admitted, however, that he did not know if the Empress security guards ever actually performed those walks.

¶ 36    Nelms acknowledged that the responsibility for the presence of fire extinguishers on site was shared by Empress and O'Neil, with O'Neil being responsible for the fire extinguishers within the construction zone, and Empress for those in the remainder of the facilities.

¶ 37    Nelms had no personal knowledge as to how the fire occurred but testified that it was his opinion that the "unfortunate accident" occurred by "a lapse of judgment or supervision" by either Jameson or O'Neil. He explained that the welder should have had better instruction, a fire extinguisher should have been present, or hot work permits should have been properly obtained.

¶ 38    Nelms was next questioned about the content of the construction contract Empress entered into with O'Neil. He acknowledged that the contract contained a liquidated damages provision and that section 4.3.10 contained a waiver of consequential damages (namely that the contractor and owner waive claims against each other for consequential damages arising out of or relating to the contract). Nelms also acknowledged that contracts of this nature usually involve a concept known as "flow down," which means that whatever is contained in the contract is "flowed down" to the lower tier to the subcontractors, so that whatever burdens are placed on a general contractor and whatever benefits are given to the general contractor flow down to the subcontractors without creating privity of contract between the subcontractors and the owner.

¶ 39    With respect to the waiver of subrogation provision in the contract, Nelms admitted that it was his understanding that Empress provided builders risk insurance coverage for the renovation, but he did not understand what this type of insurance entailed or what type of subrogation rights were obtained or triggered thereunder. He also admitted that the casino had property insurance but could not speak as to what that insurance covered.

¶ 40    In his deposition, Jacques Arragon, Empress's director of risk management, next testified, *inter alia*, that he was responsible for negotiating and drafting all of the insurance portions of the construction contract between Empress and O'Neil. Arragon acknowledged that for purposes of the renovation project, Empress ensured that it had a builder's all-risk insurance policy (with Axis), which had a miscellaneous property under construction supplement with a threshold sublimited to $10 million.

¶ 41    Arragon stated that the waiver of subrogation clause in the construction contract was a modification from the original AIA form. According to Arragon, the purpose of that provision was to have Empress protect the interests of the owner, contractor, subcontractors and sub-subcontractors of the project by way of builder's risk insurance. Arragon testified that it was his understanding that section 11.4.7 of the construction contract applied only to the builder's risk policy because it covered only insurance relating to work—*i.e.*, the renovation project. According to Arragon, the work was supposed to be covered by the builder's risk insurance, while the remainder of the adjacent buildings where the renovation was not taking place were to be covered by Empress's general property insurance policies. Arragon conceded, however, that section 11.4.5 of the construction contract applied to the two property insurance policies issued by Lloyd's and National Fire and that it includes a requirement that Empress waive any subrogation claims as to these two policies. Arragon, however, could not remember whether any special endorsements for such mandatory waivers under section 11.4.5 were ever completed.

¶ 42    Arragon admitted that, since the fire, Empress has changed its insurance coverage template to have higher builder's risk insurance and not have multiple insurers on the same loss

covering different things. Rather, now, Empress obtains property insurance and builder's risk under just one program.

¶ 43    With respect to his knowledge of any problems at the casino prior to the fire, Arragon testified he could not recall if he was aware of any fire safety issues. When presented with the February 23, 2009, site assessment report, Arragon acknowledged that he ordered that report be prepared but testified that, because the report was overall satisfactory, he relied on the fact that Empress's security guards would perform some of the fire watches and accordingly did nothing further about it.

¶ 44    Arragon also explained in his deposition that a hot works permit is a document used during the renovation that states when there will be any type of hot works, including welding, and whether the area where such welding will occur is secured (*i.e.*, if there are any combustibles within a specific distance, whether fire extinguishers are available, etc.). The hot works permits must be signed by an individual responsible for the safety of the hot works site. Arragon admitted that after the fire, upon his order, Empress has strengthened its hot works permit process.

¶ 45    In his deposition, Donald Stewart, vice president of the fire protection division of Averus, testified that Averus was responsible for cleaning the hoods at the casino since 2008. According to Stewart, there was no written contract between Averus and Empress for services. Instead, Averus submitted a signed proposal and received a verbal approval from Empress to perform the services. A copy of Averus's proposal is included in the record below us and is a two-page document, which is neither in AIA format nor includes any reference to a waiver of subrogation. What is more, Stewart explicitly admitted in his deposition that in coming to their verbal agreement, there was never any discussions between Averus and Empress about any waiver of subrogation. In addition, no one ever asked Stewart to sign a waiver of subrogation form. Stewart also acknowledged that when Averus entered into the agreement with Empress, Averus was operating under the National Fire Protection Association (NFPA) 96 standard as to the frequency of the cleanings it recommended in its proposals and that under those rules it was required to clean any contaminated portions of the exhaust system or provide Empress with a written report specifying all areas that were inaccessible or not cleaned.

¶ 46    In his deposition, Stewart further admitted that at the time of the fire, Averus was working directly for the casino and that it was not a subcontractor to anyone relative to the ongoing renovation project.

¶ 47    Stewart stated that, prior to the fire, the last time Averus cleaned the buffet kitchen exhaust hood was on October 19, 2008. On the advice of his attorney, Stewart refused to answer counsels' questions about when Averus last cleaned the horizontal main line in the pavilion area.

¶ 48    In his deposition John Russell, president of O'Neil, next testified, *inter alia*, that he was principally responsible for negotiating the construction contract between O'Neil and Empress, with some help from Nelms and Arragon. Russell testified that it was his understanding, both from the language of the contract and the negotiations he had with Empress's principals, that during the renovation project O'Neil would have access to all of Empress's insurance policies (including builder's risk, property, use, etc.). Specifically, Russell averred that when read as a whole, section 11.4 of the construction contract clearly required Empress to purchase builder's risk insurance and make available to O'Neil insurance for any adjacent property, as well as insurance for any loss of use. According to Russell, section 11.4.1 required Empress to provide

the builder's risk insurance. Section 11.4.1.3 confirmed that Empress was responsible for all deductibles associated with its policies and required Empress to purchase insurance for loss of use and make it available to O'Neil. This section also included a waiver of subrogation. According to Russell, section 11.4.5 further required Empress to provide O'Neil with insurance for adjacent properties and included a waiver of subrogation. Under section 11.4.7, Empress waived subrogation for any damage caused by fire. Finally, section 11.4.1.2 provided that if Empress did not provide any of those coverages, it would have an obligation to notify O'Neil so that it could purchase the insurance and change the order to increase the price of the renovation project.

¶ 49    Russell also testified in his deposition that it was his understanding that Empress would waive any rights to subrogation under the contract. He testified that his objective in negotiating is to make sure, if at all possible, that his company transfers all of the risk that is available to the owner's policies. Otherwise, O'Neil needs to purchase additional polices and burden the project with additional costs. Accordingly, Russell expected that the standard text of the AIA would be in play.

¶ 50    Russell further testified that the renovation project was not limited to any particular area of the casino complex and that O'Neil's work encompassed the whole property.

¶ 51    In his deposition Joseph Cassacio, an officer of National Fire, testified, *inter alia*, that the sublimit of $10 million contained in National Fire's property insurance policy for Empress was intended to delineate between minor and large construction projects. Specifically, if a construction project involved costs of up to $10 million, then those costs would be covered under the National Fire policy. Cassacio admitted, however, that National Fire paid Empress insurance proceeds after the fire for the "loss of the property that was next door" and caused by that fire.

¶ 52    In addition, Cassacio testified that it was his opinion that National Fire had not waived any subrogation rights under the construction contract. While Cassacio acknowledged that the National Fire policy states that if the insured (Empress) has waived its rights to recover prior to a loss then the insured cannot pursue subrogation, he testified that such a waiver must be express (by naming the additional insured and by way of endorsement of the existing insurance policy). According to Cassacio any waiver of subrogation in the construction contract applies only to the builder's risk policy. Specifically, Cassacio asserted that section 11.4.5 of the construction contract does not pertain to National Fire because National Fire's policy was not obtained during the renovation project and there was no endorsement of any such waiver by National Fire.

¶ 53                                    F. Summary Judgment

¶ 54    After discovery, the defendants moved for summary judgment, arguing that the plaintiffs' claims were barred by the waivers of subrogation in the construction contract.[2] In support of their motion for summary judgment the defendants attached the following exhibits: (1) their

_____

[2]Although the defendants initially filed their motion for summary judgment only against Empress in case No. 12 L 12077, all the parties agreed, and the trial court subsequently ordered, that the defendants' motion for summary judgment (as well as the parties' briefs with respect to that motion) be considered as a motion for summary judgment brought by all defendants against all plaintiffs in both cases (Nos. 12 L 12077 and 14 L 3223).

two complaints; (2) the construction contract; (3) Empress's three insurance policies; (4) Empress's discovery responses (admitting to having received the insurance proceeds from the insurers); and (5) the depositions of Nelms, Arragon, and Cassacio.

¶ 55 The plaintiffs filed their response to the motion for summary judgment, arguing, *inter alia*, that under the plain language of the construction contract (1) the waiver of subrogation clause did not apply to the two property insurers (National Fire and Lloyd's) or to Averus and (2) Empress did not waive its right to recover its deductibles. In support they attached, *inter alia*, (1) the depositions of Stewart and Russell, (2) a subcontract with Jameson, (3) the AIA official guide, and (4) Haberzetle's statement.

¶ 56 After reviewing the extensive briefs filed by the parties, and having heard oral arguments on the issues raised, on March 30, 2010, the trial court granted summary judgment in favor of the defendants. In doing so, the court held that the plain language of the construction contract reveals the parties' intent that Empress assume the risk of loss for any fire loss and look to its different insurance policies as the single source of recovery. Accordingly, the court concluded that Empress had agreed to waive all rights to subrogation against all possible at-fault parties. In addition, the court found that pursuant to the plain language of the construction contract, Empress was responsible for its own insurance deductibles. The plaintiffs now appeal.

¶ 57                                    II. ANALYSIS

¶ 58 Before addressing the merits, we begin by noting the well-established principles regarding grants of summary judgment. "Summary judgment is a drastic measure of disposing of litigation" (*Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12) and should only be granted "if the movant's right to judgment is clear and free from doubt" (*Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992)). See also *Schade v. Clausius*, 2016 IL App (1st) 143162, ¶ 18. Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012); see also *Carlson v. Chicago Transit Authority*, 2014 IL App (1st) 122463, ¶ 21; *Fidelity National Title Insurance Co. of New York v. West Haven Properties Partnership*, 386 Ill. App. 3d 201, 212 (2007) (citing *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004)); *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550, 556 (2007). In determining whether the moving party is entitled to summary judgment, the court must construe the pleadings and evidentiary material in the record in the light most favorable to the nonmoving party and strictly against the moving party. *Schade*, 2016 IL App (1st) 143162, ¶ 17; see also *Happel v. Wal-Mart Stores, Inc.*, 199 Ill. 2d 179, 186 (2002). "Although the burden is on the moving party to establish that summary judgment is appropriate, the nonmoving party must present a *bona fide* factual issue and not merely general conclusions of law." *Morissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010). "A genuine issue of material fact exists where the facts are in dispute or where reasonable minds could draw different inferences from the undisputed facts." *Morrissey*, 404 Ill. App. 3d at 724; see also *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114 (1995) ("[W]here reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to [the] material fact, summary judgment should be denied and the issue decided by the trier of fact."). Our review of the trial court's entry of summary judgment is *de novo*. See *Village of Palatine v. Palatine Associates,*

*L.L.C.*, 2012 IL App (1st) 102707, ¶ 43; see also *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 349 (1998); *Outboard Marine*, 154 Ill. 2d at 102.

¶ 59    On appeal, the plaintiffs make numerous contentions of error, in some instances pertaining to all of them and in others only to some. For purposes of clarity, we begin by addressing those arguments raised by all of the plaintiffs.

¶ 60                                        A. Averus

¶ 61    First, all of the plaintiffs (Empress, Axis, National Fire, and Lloyd's) argue that the trial court erred when it granted summary judgment in favor of Averus, on the basis of the waiver of subrogation clause in section 11.4.7 of the construction contract, where that clause could not have applied to Averus, since Averus operated under a separate pre-existing oral agreement with Empress and its work in the casino was not related to the renovation project. The defendants, on the other hand, assert that pursuant to article 6 of the construction contract, Averus, who was hired by Empress to perform "other operations on site," became a "contractor" for purposes of the waiver of subrogation in section 11.4.7. For the reasons that follow, we disagree with the defendants.

¶ 62    In interpreting a contract, our primary objective is to effectuate the intent of the parties. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011); see also *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007). In doing so, we first look to the plain language of the contract to determine the parties' intent. *Thompson*, 241 Ill. 2d at 441; see also *Gallagher*, 226 Ill. 2d at 233. If the words in the contract are clear and unambiguous, we must give them their plain, ordinary and popular meaning. *Thompson*, 241 Ill. 2d at 441 (citing *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004)). However, if the language of the contract is ambiguous, we may look to extrinsic evidence to determine the parties' intent. *Thompson*, 241 Ill. 2d at 441; *Gallagher*, 226 Ill. 2d at 233. Language in a contract is ambiguous if it is "susceptible to more than one meaning." *Thompson*, 241 Ill. 2d at 441. However, mere disagreement between the parties concerning a provision's meaning will not automatically render such language ambiguous. *Thompson*, 241 Ill. 2d at 443. Rather, instead of focusing on one clause or provision in isolation, we, as the reviewing court, must read the entire contract in context and construe it as a whole, viewing each provision in light of the other ones. See *Gallagher*, 226 Ill. 2d at 233; see also *Thompson*, 241 Ill. 2d at 441. In doing so, we will not add language or matters to a contract about which the instrument is silent, nor add words or terms to the agreement to change the plain meaning, as expressed by the parties. *Sheehy v. Sheehy*, 299 Ill. App. 3d 996, 1001 (1998).

¶ 63    In the present case, section 11.4.7 of the construction contract provides in pertinent part:

> "Waivers of Subrogation. The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents, and employees, each of the other *** and separate contractors described in Article 6 *** for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.4 or other property insurance applicable to the Work ***."

¶ 64    Further, article 6, which is titled "Construction by Owner or by Separate Contractors," states in relevant part:

> "§ 6.1.1 The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in

connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these including those portions related to insurance and waiver of subrogation."

¶ 65    In addition, section 6.1.2 provides that "[w]hen separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term 'Contractor' in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement." Finally, section 6.1.4 states that "when the Owner performs *** operations related to the Project with the Owner's own forces, the Owner shall be deemed to be subject to the same obligations and to have the same rights which apply to the Contractor under the Conditions of the Contract, including without excluding others, those stated in [*inter alia*] Article[ ] *** 11."

¶ 66    Construing these sections of the contract as a whole, we find that under the plain language of the construction contract, Averus does not fall into the category of entities to which the waiver of subrogation applies. The plain language of section 11.4.7 makes clear that the waiver is limited to a class of defined participants, including (1) the owner, (2) the contractor, (3) the subcontractor, (4) the sub-subcontractors, and (5) their respective agents and employees, as well as "separate contractors described in Article 6." The construction contract clearly identifies Empress as the owner and O'Neil as the contractor. In addition, the contract defines a "subcontractor" as an "entity who has a direct contract with the Contractor to perform a portion of the Work at the site" and a "sub-subcontractor" as an "entity who has a direct or indirect contract with the Contractor to perform a portion of the Work at the site." As such, since Averus admittedly had no direct contract with either O'Neil or any of O'Neil's subcontractors, Averus does not fall into the category of either subcontractor or a sub-subcontractor. Similarly, because Averus admitted that it had a separate and preexisting contract with Empress to periodically clean ductwork in the casino, it was neither Empress's employee nor agent. Accordingly, aside from the class defined by article 6, Averus does not fall into any of the defined categories to which the waiver would apply.

¶ 67    The defendants nonetheless argue that because section 6.1.1 of the contract permits Empress to "award separate contracts" in connection with "other *** operations on the site," Averus is a "separate contractor" within the meaning of article 6 so as to fall within the purview of the waiver of subrogation clause. The defendants, however, conveniently forget to mention that section 6.1.1 conditions Empress's award of separate contracts for the performance of "other construction or operations on the site" to those operations "under Conditions of the Contract identical or substantially similar to these including those portions related to insurance and waiver of subrogation." "Conditions of the Contract" are explicitly defined in the construction contract, and include General, Supplementary and Other Conditions. The "General Conditions" are defined as the AIA Document A201-1997, as modified, and the "Supplementary and Other Conditions" are defined as those issued and incorporated via Change Orders. Accordingly, it is clear from the plain language of section 6.1.1 that separate contracts for "other operations on site" do not include just *any* operations conducted at the casino but, rather, must be made under a contract identical or similar to AIA Document A201-1997, *i.e.*, they must be related to construction. This is further evidenced by the very title of article 6, which indicates that it applies to "*Construction* by Owner or by Separate Contractors." (Emphasis added.) For that same reason, section 6.1.4 confers on Empress obligations to its separate contractors "under the Conditions of the Contract," and

including waiver of subrogation, only where Empress "performs \*\*\* operations *related to the Project* with [its] own forces." (Emphasis added.) Since, in the present case, Averus's vice president Stewart admitted that it operated under a completely separate, pre-existing, oral, non-AIA contract with Empress to clean the casino ductwork, Averus cannot now avail itself of the waiver of subrogation provision in section 11.4.7. In addition, Stewart admitted in his deposition that in negotiating Averus's contract with Empress, the parties never discussed or contemplated any waiver of subrogation.

¶ 68    Accordingly, under these circumstances, the trial court erred when it granted summary judgment in favor of the defendant Averus.

¶ 69                    B. Waiver of Subrogation for Willful and Wanton Misconduct

¶ 70    With respect to the remaining defendants, the plaintiffs (Empress, Axis, National Fire, and Lloyd's) all collectively assert that the trial court erred in granting summary judgment pursuant to the waiver of subrogation clause because public policy in Illinois bars the enforcement of exculpatory clauses where heighted misconduct is alleged. The plaintiffs assert that because they proceeded with claims for willful and wanton misconduct, the court should have found the waiver of subrogation provision unenforceable. For the reasons that follow, we disagree.

¶ 71    The general purpose of a waiver of subrogation provision is to permit parties to a construction contract to exculpate each other from personal liability in the event of property loss or damage to the work occurring during construction, relying instead on the insurance purchased by one of the parties to provide recovery for that loss. *Intergovernmental Risk Management v. O'Donnell, Wicklund, Pigozzi & Peterson Architects, Inc.*, 295 Ill. App. 3d 784, 791 (1998); see also *Village of Rosemont v. Lentin Lumber Co.*, 144 Ill. App. 3d 651 (1986). Such provisions shift the risk of loss to the insurance company to facilitate timely completion of the project and avoid the prospect of time-consuming and expensive litigation, regardless of which party is at fault. See *Intergovernmental Risk*, 295 Ill. App. 3d at 793; see also *Village of Rosemont*, 144 Ill. App. 3d at 660 (" 'The insurance clause shifts the risk of loss to the insurance company regardless of which party is at fault.' [Citation.]" ); *Ralph Korte Construction Co. v. Springfield Mechanical Co.*, 54 Ill. App. 3d 445 (1977).

¶ 72    In *Intergovernmental Risk*, this court had an opportunity to address an argument similar to the one raised here by the plaintiffs. In that case, the plaintiffs argued that an AIA construction contract, with a waiver of subrogation clause identical to the one here, could not apply to damages caused by either "negligent" or "wrongful acts" of the defendant. *Intergovernmental Risk*, 295 Ill. App. 3d at 792. This court disagreed, finding that the waiver of subrogation provision was contingent upon the types of perils that could result in property damage and loss and not on what caused those perils (*i.e.*, the manner by which the perils were caused). *Intergovernmental Risk*, 295 Ill. App. 3d at 795-96. As the court explained:

> "[The waiver of subrogation clause] identifies the types of perils that could cause property damage and loss. It identifies fire as a distinct peril. It does not differentiate between the manner in which that peril arises, that is, whether by acts of God or by the intentional or unintentional, negligent or reckless acts of human beings. In point of fact, fire loss could result from any of these acts, although as noted in one case it 'nearly always [is] caused by negligence.' [Citation.] To the extent that this provision does purport to enumerate different types of human conduct that could cause losses of property, it does so with respect to nonfire-related physical loss or damage; and, even

- 15 -

there, it purports only to be inclusive, not preclusive. Moreover, strong argument can be made that even with respect to those property losses the focus is not upon the differing human motivations behind the conduct causing the damage but upon the different types of hazards resulting from categories of human conduct conventionally treated as separate underwriting coverages." *Intergovernmental Risk*, 295 Ill. App. 3d at 795-96.

Accordingly, the court in that case concluded that under the express language of the contract, the owner was required to obtain "property insurance that insured against damage to property caused by fire *regardless of the fire's origin or cause*" (emphasis added), and as such, the waiver of subrogation extended to the fire loss, regardless of how the fire had been started. *Intergovernmental Risk*, 295 Ill. App. 3d at 796.

¶ 73        We agree with the rationale in *Intergovernmental Risk* and find it directly applicable to the cause at bar. Just as in *Intergovernmental Risk*, the parties here negotiated the construction contract using the AIA form. In doing so, they obligated Empress, as the owner, to purchase insurance covering "without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage, including *** [*inter alia*], theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup." In addition, the parties explicitly negotiated a waiver of subrogation for damages caused by fire. Specifically, pursuant to section 11.4.5 they agreed that, "if during the Project construction period" Empress insured its properties, it would "waive all rights in accordance with the terms of Section 11.4.7 for damages caused by fire or other causes of loss." Section 11.4.7 further explicitly provided that Empress and O'Neil would waive all rights against "(1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, Architect's consultants, separate contractors described in Article 6, if any and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.4." In addition, the parties agreed that the waiver of subrogation would "be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damage."

¶ 74        Just as in *Intergovernmental Risk*, we hold that the parties here expressly foresaw the potential of property loss occurring due to fire and chose to impose on Empress the duty to insure against any such loss (regardless of fault), expressly waiving all rights against each other for damages caused by such perils. See *Intergovernmental Risk*, 295 Ill. App. 3d at 796; see also *Village of Rosemont*, 144 Ill. App. 3d at 661 (construing similar waiver of subrogation provision to hold that "the parties expressly waived all rights against each other for damages caused by perils covered under the policy" and "intended to allocate property loss to an insurer and to limit the recourse of the plaintiff, the party acquiring the policy, solely to the insurance proceeds"); *Ralph Korte*, 54 Ill. App. 3d at 447 (interpreting waiver of subrogation provision to mean that "the parties had agreed, in effect, to assume the risk of loss as between themselves due to fire or other perils, to the extent each party was covered by insurance"). Nothing in the language of the waiver of subrogation clause indicates that the parties intended there to be an exception for fires caused by willful and wanton conduct. Since "[t]he law and the public policy of Illinois permit and require that competent parties be free to contract with one

another," we conclude that the trial court properly applied the waiver of subrogation clause to bar the plaintiffs' claims attempting to recoup losses they incurred as a result of the fire. *Liccardi v. Stotl Terminals, Inc.*, 178 Ill. 2d 540, 549 (1997); see also *Saba Software, Inc. v. Deere & Co.*, 2014 IL App (1st) 132381, ¶ 60 ("Illinois's public policy strongly favors freedom to contract [citation] and broadly allows parties to determine their contractual obligations. [Citation.] *Hussein v. L.A. Fitness International, L.L.C.*, 2013 IL App (1st) 121426, ¶ 11. As a result, we exercise sparingly the power to declare a private contract void as against public policy." (Internal quotation marks omitted.)).

¶ 75        In coming to this conclusion, we further find that in making their public policy argument, the plaintiffs confuse waivers of subrogation with exculpatory clauses. The law in Illinois is well settled that a waiver of subrogation is not an exculpatory clause. See, *e.g.*, *Allstate Indemnity Co. v. ADT LLC*, 110 F. Supp. 3d 856, 862 (N.D. Ill. 2015) ("[S]ubrogation waivers are not true exculpatory provisions. They merely allocate risk of loss; they do not immunize the wrongdoer from all liability, nor do they require the injured parties to give up all their claims or leave them uncompensated."); see also *Hartford v. Burns International Security Services, Inc.*, 172 Ill. App. 3d 184 (1988); *Bastian v. Wausau Homes, Inc.*, 635 F. Supp. 201 (N.D. Ill. 1986).

¶ 76        Similar to the present case, in *Hartford*, 172 Ill. App. 3d 184, the plaintiff insurer argued that a waiver of subrogation in a contract for security services for the Board of Trade Building was an exculpatory clause that should be deemed void (as against public policy) both under New York and Illinois law. This appellate court disagreed, holding:

        "Here, we are dealing with two corporations which voluntarily entered into a contract at arm's length, with full freedom to do so. The waiver provision in question here is not a true exculpatory clause. It is merely an agreement between the parties to shift most of the risk of loss to a third party, namely: the [insured Building's] insurance company, *i.e.*, [the plaintiff insurer]. The clause did not immunize [the Building] from all liability nor did it require [the insured Building] to give up all claims against [the defendant]. The [insured Building] gave up only its rights against the [defendant] to the extent that it was insured. Thus, the waiver provision *** does not violate Illinois public policy ***." *Hartford*, 172 Ill. App. 3d at 190.

¶ 77        In coming to this decision, the court in *Hartford* relied in part on the decision in *Bastian*, 635 F. Supp. 201. In that case the plaintiff home purchasers alleged that a waiver of subrogation clause in a sales contact was an unenforceable exculpatory clause because it was unconscionable and violated Illinois public policy. See *Bastian*, 635 F. Supp. at 202. Applying Illinois law, the federal court in that case disagreed, explaining the distinction between a waiver of subrogation and an exculpatory clause:

        "The clause in question here is not even a true exculpatory clause. With it the parties agree to shift most of the risk of property loss to a third party, namely the Bastians's insurance company; or, worded another way, by the clause Wausau became an additional beneficiary of the Bastians's insurance policy. [Citation.] Such a clause does not leave the injured party uncompensated. Indeed, the Bastians have already been largely compensated for their loss, albeit from their own insurance rather than by Wausau." *Bastian*, 635 F. Supp. at 203.

¶ 78        In making their argument, the plaintiffs here fail to cite to any Illinois decision in which the court refused to enforce an insurance subrogation waiver on the basis that willful and wanton

misconduct was alleged. Rather, the majority of the decisions they cite discuss contractual exculpatory provisions. See, *e.g.*, *Oelze v. Score Sports Venture, LLC*, 401 Ill. App. 3d 110 (2010) (exculpatory clause in membership agreement signed by a member who tripped on a rope ladder during a tennis match); *Garrison v. Combined Fitness Centre, Ltd.*, 201 Ill. App. 3d 581 (1990) (exculpatory clause in a health club membership agreement signed by a member who was injured while lifting weights); *Downing v. United Auto Racing Ass'n*, 211 Ill. App. 3d 877 (1991) (release signed by a pit crew member who was struck by a car during a race); *Falkner v. Hinckley Parachute Center, Inc.*, 178 Ill. App. 3d 597 (1989) (exculpatory clause within a release signed by a parachutist who died when his parachute became entangled).

¶ 79    The only Illinois case the plaintiffs offer in support of their argument is *Third Swansea Properties, Inc. v. Ockerlund Construction Co.*, 41 Ill. App. 3d 894 (1976). Although at first blush that decision appears factually similar, a thorough reading reveals that it is not a waiver of subrogation case. In *Third Swansea*, the plaintiffs, owners (and lessor-occupants) of a property on which a bakery addition was being erected and that was damaged by fire during the construction, sued, *inter alia*, a subcontractor involved in the project. *Third Swansea*, 41 Ill. App. 3d at 895. While the contract at issue contained a waiver of liability clause, it also obligated the plaintiffs to obtain insurance, which they apparently failed to do so, leaving them uncompensated for their loss. See *Third Swansea*, 41 Ill. App. 3d at 896-97. Although the court in *Third Swansea* concluded that the plaintiffs could proceed against the subcontractor with their willful and wanton claims, it found that it was unable to determine from the record presented whether the insurance, if it had been obtained by the plaintiffs, would have been so comprehensive so as to bar the plaintiffs' subrogation action or whether it would have covered only the subcontractor's interest in the project and thus allowed the action for damages directly against the subcontractor. Since the parties here do not dispute that Empress had three insurance policies in place at the time of the renovation project, and that the three insurers collectively reimbursed Empress for its fire losses, *Third Swansea* is inapplicable.

¶ 80    Therefore, we conclude that nothing in our State's law or public policy prevents competent parties to a construction contract to negotiate a full waiver of subrogation rights (regardless of fault) among themselves, so as to require one of them to obtain insurance and have the insurer provide the sole recovery for the identified loss. Accordingly, we conclude that the waiver of subrogation clause in the construction contract was applicable to bar the plaintiffs' willful and wanton claims and permit the trial court to enter summary judgment. As such, we must next determine whether that clause applies to all three insurers, and if so to what extent.

¶ 81                    C. Application of Waiver to the Two Property Insurance Policies

¶ 82    Axis concedes that under the plain language of the construction contract, the waiver of subrogation provision applies to it as the builder's risk insurer. Empress, National Fire, and Lloyd's agree and further contend that the waiver provision is limited to Axis's builder's risk insurance policy and therefore does not apply to either of Empress's property insurance policies with National Fire and Lloyd's. We disagree.

¶ 83    The plain language of the construction contract is clear and contemplates that the waiver of subrogation applies both to the specific renovation builder's risk insurance and the general property insurers.

¶ 84    Under section 11.4.1 of the contract, Empress was obligated to purchase and maintain until final payment (*i.e.*, the completion of the project) "property insurance written on a builder's

risk 'all-risk' or equivalent policy form." Section 11.4.1.1 enumerated the types of coverage that must be included "without limitation" in such a builder's risk policy and included perils like fire. Section 11.4.7 further set forth the waiver of subrogation, obligating the parties to waive all rights against each other for "damages caused by fire or other causes of loss to the extent covered by *property insurance obtained pursuant to this Section 11.4 of other property insurance applicable to the Work.*" Section 11.4.5 contains an additional waiver of subrogation provision and further obligates Empress to waive all rights in accordance with the terms of section 11.4.7 "for damages caused by fire or other causes of loss covered by" any "separate property insurance," if "during the Project construction period [it] insures properties, *** at or adjacent to the site by property insurance under policies separate from those insuring the Project, or if after final payment property insurance is to be provided on the completed project through a policy or policies other than those insuring the Project during the construction period."

¶ 85    Reading the aforementioned language of the construction contract as a whole, for the reasons that shall be more fully articulated below, we hold that pursuant to both section 11.4.7 and 11.4.5, Empress unambiguously agreed to waive any and all of National Fire's and Lloyd's subrogation rights.

¶ 86    With respect to the waiver contained in section 11.4.7, the contract here is identical to the one at issue in *Intergovernmental Risk*. In that case, just as here, the plaintiffs argued that the section 11.4.7 waiver of subrogation did not apply to the all-risk insurance policies because they were not "builder's all-risk policies" purchased specifically for the construction project but rather were policies that had been purchased by the Village more than 10 years before the renovation construction project began. *Intergovernmental Risk*, 295 Ill. App. 3d at 796. In rejecting the plaintiffs' argument, the court in *Intergovernmental Risk* first noted that the plaintiffs' interpretation of the waiver of subrogation would have the effect of rendering the phrase in section 11.4.7 "or other property insurance applicable to the Work" redundant and meaningless since it would not allow for any alternative form of insurance implied by the word "or." *Intergovernmental Risk*, 295 Ill. App. 3d at 796-97.

¶ 87    The court then relied on the interpretation of similar provisions by courts of other jurisdictions, which also found that general all-risk policies obtained prior to execution of the construction contract constituted "other property insurance applicable to the Work" (internal quotation marks omitted) triggering the waiver of subrogation contained in section 11.4.7. See *Intergovernmental Risk*, 295 Ill. App. 3d at 797 (quoting *Lloyd's Underwriters v. Craig & Rush, Inc.*, 32 Cal. Rptr. 2d 144, 146 (Ct. App. 1994), and citing *E.C. Long, Inc. v. Brennan's of Atlanta, Inc.*, 252 S.E.2d 642 (Ga. Ct. App. 1979), and *Haemonetics Corp. v. Brophy & Phillips Co.*, 501 N.E.2d 524 (Mass. Ct. App. 1986)).

¶ 88    The court in *Intergovernmental Risk* further recognized that the issue was not "whether the policies [we]re called 'all-risk' or 'general liability' " but rather "whether those policies cover[ed] the risk and losses delineated in the construction agreement between the [parties]." *Intergovernmental Risk*, 295 Ill. App. 3d at 797-98.

¶ 89    We agree with the rationale of *Intergovernmental Risk* and see no reason to depart from it in this case.

¶ 90    Empress, National Fire, and Lloyd's nonetheless argue that *Intergovernmental Risk* is inapplicable to the cause at bar because, unlike in that case, the National Fire and Lloyd's

policy explicitly contained language excluding coverage for construction projects in excess of $10 million. We disagree.

¶ 91    While it is true that the two policies contain language limiting insurance coverage for property in the course of construction to incidental course of construction (defined as projects of $10,000 million or less), the term "property" in those policies is very broadly defined and also includes, without limitation, "property in the care, custody or control of the Insured or for which the Insured is legally liable to insure" and "property of the Insured in the care, custody or control of others." Since Empress's vice president for design and construction, Nelms, admitted that during the construction, Empress placed the casino in the care and control of O'Neil and, under the construction contract, was legally liable to insure its property during the renovation, we are unpersuaded by National Fire and Lloyd's argument attempting to limit the policy's coverage. What is more, National Fire and Lloyd's ignore the fact that the language of their policies' own subrogation clause explicitly provides that they "will not acquire any rights of recovery that the Insured has expressly waived prior to a loss." Since Empress agreed to waive any subrogation rights against the defendants prior to the fire, by way of the construction contract and by the express terms of their own policies, National Fire and Lloyd's are also bound by that waiver.

¶ 92    Accordingly, applying the rationale of *Intergovernmental Risk* to the facts of this case, we conclude that the waiver of subrogation clause in section 11.4.7 applied equally to National Fire's and Lloyd's policies. See *Intergovernmental Risk*, 295 Ill. App. 3d at 798; see also *Haemonetics Corp.*, 501 N.E.2d at 525-26.

¶ 93    However, even if we were to ignore the holding in *Intergovernmental Risk* and were to construe "other property insurance applicable to the Work" in section 11.4.7 as excluding National Fire's and Lloyd's policies, the two property insurers would nonetheless be bound by the waiver of subrogation prescribed in section 11.4.5. That section provides that a section 11.4.7 waiver of subrogation is triggered "if during the Project construction period [Empress, as] the Owner *insures* properties, real or personal or both, at or adjacent to the site *by property insurance under policies separate from those insuring the Project*." (Emphases added.)

¶ 94    Contrary to National Fire and Lloyd's position, this provision has no temporal requirement. The owner is not required to purchase the separate insurance policy after the project has already begun. The key word of this section is "insures." The plain language of section 11.4.5 does not state that the waiver applies if the owner *procures* policies during the construction period. Rather, the paragraph's present tense use of "insures" suggests only that the separate policy is in existence during the project, not that it was procured during the project. See *Hunt Construction Group, Inc. v. Hun School of Princeton*, No. 08-3550, 2010 WL 3724279, at *13 (D.N.J. Sept. 16, 2010).

¶ 95    In the present case, there is no dispute that Empress had in existence separate property "all-risk" insurance policies with National Fire and Lloyd during the renovation project. What is more, National Fire's designated representative, Cassacio, admitted in his deposition that National Fire "paid for the loss to [Empress's] property that was next door [to the casino]" (*i.e.*, adjacent to the site). Accordingly, given this concession, Empress and National Fire cannot contest that the plain language of section 11.4.5 contemplated their policies and triggered the waiver of subrogation clause in section 11.4.7.

¶ 96    Empress, National Fire, and Lloyd's nevertheless contend that we should not focus on the language of the subrogation waivers but rather begin our analysis with the language of section

11.4, requiring Empress to obtain insurance. They contend that because both the waiver of subrogation (section 11.4.7) and the separate property insurance (section 11.4.5) clauses are included in section 11.4, and that section requires Empress to procure "builder's risk all-risk" only for the work and not Empress's entire property (*i.e.*, buildings adjacent to the casino), the scope of the waiver should be just as narrow and apply (1) only to the work and (2) only to the damages related to the work (*i.e.*, the value of the materials, tools, and labor incorporated into the renovation project and not the extra expenses, such as business interruption). We disagree.

¶ 97    In that respect, we note that the majority of jurisdictions that have had the opportunity to address this issue have rejected the "work or non-work" distinction proposed here by the plaintiffs. See *Board of Commissioners v. Teton Corp.*, 30 N.E.3d 711, 716 (Ind. 2015); *Lexington Insurance Co. v. Entrex Communication Services, Inc.*, 749 N.W.2d 124, 135 (Neb. 2008); *Federal Insurance Co. v. Woodruff Construction*, No. 12-0821, 2012 WL 5954588 (Iowa Ct. App. Nov. 29, 2012); *ASIC II Ltd. v. Stonhard, Inc.*, 63 F. Supp. 2d 85 (D. Me. 1999); *Lloyd's Underwriters*, 32 Cal. Rptr. 2d 144; *Housing Investment Corp. v. Carris*, 389 So. 2d 689 (Fla. Dist. Ct. App. 1980); *E.C. Long, Inc. v. Brennan's of Atlanta, Inc.*, 252 S.E.2d 642 (Ga. Ct. App. 1979); *Willis Realty Associates v. Cimino Construction Co.*, 623 A.2d 1287 (Me. 1993); *Haemonetics*, 501 N.E.2d 524; *Employers Mutual Casualty Co. v. A.C.C.T., Inc.*, 580 N.W.2d 490 (Minn. 1998); *Chadwick v. CSI, Ltd.*, 629 A.2d 820 (N.H. 1993); *Westfield Insurance Group v. Affinia Development, LLC*, 2012-Ohio-5348, 982 N.E.2d 132; *Trinity Universal Insurance Co. v. Bill Cox Construction, Inc.*, 75 S.W.3d 6 (Tex. App. 2001). The rationale has been that if the waiver extended only to damages to the work, there would be no need to include the waiver in section 11.4.5 for damages to property adjacent to the site covered by policies separate from those described in section 11.4.7. See *Federal Insurance*, 2012 WL 5954588, at *4 (holding that "[s]ection 11.4.5 clearly provides for waiver of all rights for damages covered by any property insurance policies 'separate from those insuring the project' that cover the 'properties, real or personal or both, at or adjacent to the site,' " and rejecting any work-non-work distinction, noting that it would "render section 11.4.5 of no effect to the construction project because the policies described in section 11.4.5 are 'separate from those insuring the project' and include 'property *** adjacent to the site' "); see also *Teton*, 30 N.E.3d at 717 (holding that "the AIA contract provides that even when the Owner has both builders-risk coverage for the work and separate property insurance for 'adjoining or adjacent' property, its subrogation waiver *** extends to 'fire or other perils covered by this separate property insurance policy' " because the separate provision would be "an anomaly within the AIA contractual scheme" if the parties already expected the liability insurance to cover "non-work damages"); see also *Lexington*, 749 N.W.2d at 134-35 ("We understand *** [section 11.4.5] to mean that if the owner acquires a separate property insurance policy to cover non-Project property—a policy that did not cover the Project or Work property—and the non-Project property is damaged, the owner waives subrogation rights for the insurer as to those damages. So even though the damage occurred to non-Work property, the owner waived subrogation rights because the damages were insured.").

¶ 98    We agree with the rationale of these decisions and see no reason to depart from it here. Accordingly, we conclude that the waiver of subrogation clause in section 11.4.5 applied to National Fire's and Lloyd's policies.

¶ 99                                                                      D. Breach of Contract

¶ 100        Empress, National Fire, and Lloyd's next contend that the defendants'[3] multiple breaches of the construction contract should bar enforcement of the waiver of subrogation clause. Specifically, citing to the "time is of the essence clause," the three plaintiffs first argue that because completion of the renovation project on "time" was a material provision of the construction contract, and was never fulfilled as a result of the fire, the plaintiffs should not be forced to fulfill their waiver of subrogation obligations under the agreement. Furthermore, the three plaintiffs assert that because the construction contract required the contractor to obtain liability insurance and to indemnify the owner for claims arising out of the performance of the work, it conflicted with the waiver of subrogation clause, and therefore the waiver is not enforceable. For the reasons that follow, we disagree.

¶ 101        At the outset, we note that contrary to the plaintiffs' assertion, the waiver of subrogation provision is not limited to negligence actions but can apply with equal force to contract claims. See *Village of Rosemont*, 144 Ill. App. 3d at 665-66 (holding that a waiver of subrogation provision applied to bar breach of contract, implied warranty, and strict liability claims). As already explained above in more detail, the parties here agreed that any casualty loss resulting from a fire would be borne solely by Empress's property insurance and that accordingly Empress expressly waived all claims against the defendants arising from such a loss covered by such insurance. The fire was related to performance on the contract and therefore the loss and damage from the fire were all covered under the property insurance policies Empress was required to maintain. As such, the waiver of subrogation bars the breach of contract claims as well. See *Village of Rosemont*, 144 Ill. App. 3d at 665-66.

¶ 102        Turning specifically to the plaintiffs' arguments, with respect to the "time is of the essence" clause, we find that the plaintiffs have failed to present any facts establishing that this provision was material to the contract or, for that matter, any rationale to support the position that the defendants' failure to complete the project within the contemplated time frame would or should somehow negate the waiver of subrogation provision. It is well-settled that the mere fact that the parties include a "time is of the essence" provision in a contract does not automatically make the provision material. See *Asset Recovery Contracting, LLC v. Walsh Construction Co. of Illinois*, 2012 IL App (1st) 101226, ¶ 73 (holding that "even where the contract contains an express clause stipulating that 'time is of the essence,' Illinois courts will inquire into the situation of the parties and the underlying circumstances to determine whether a delay in performance resulted in a 'material breach' " (internal quotation marks omitted)).

¶ 103        We similarly reject the plaintiffs' contention that the provisions of the construction contract requiring the contractor to obtain liability insurance and to indemnify Empress for claims arising out of the performance of the work conflicted with the waiver of subrogation clause, so as to render those provisions an exception to the waiver. This same argument was raised and rejected by the plaintiffs in *Village of Rosemont*, 144 Ill. App. 3d at 663. In that case, the appellate court held that the waiver of subrogation clause was part of the owner's property insurance obligations while the insurance and indemnity provision were tied to the contractors' liability insurance obligations. *Village of Rosemont*, 144 Ill. App. 3d at 663. The court

_____

[3]The allegations in Empress's complaint for breach of contract were made against all the defendants, except for Averus. The breach of contract issues raised on appeal accordingly also exclude Averus.

explained that it was apparent that the liability insurance and the indemnification provisions were "entirely consistent with the explicit waiver of claims" in the waiver of subrogation clause, since they were intended to provide a different type of coverage (*i.e.*, contractor's liability insurance versus property insurance due to fire loss). *Village of Rosemont*, 144 Ill. App. 3d at 663. The same is true here, where the type of insurance the defendant contractor was required to obtain under the construction contract, and to which the three plaintiffs cite, included liability insurance (such as workers' compensation and employers' liability, commercial auto, umbrella, and contractor's equipment), while the property insurance and waivers of subrogation required Empress to maintain coverage for property loss in the event of, *inter alia*, fire damage to the renovation project and to waive its subrogation rights. Moreover, the express language of the waiver of subrogation makes clear that the waiver will trump any indemnification obligations. See *supra* ¶ 15 (" 'A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, *** and whether or not the person or entity had an insurable interest in the property damage.' "). To accept the plaintiffs' interpretation, in contravention of the already established rule in *Village of Rosemont*, so as to create an exception to the waiver of subrogation for contractor's liability insurance, would render the waiver of subrogation, which was intended to shift the risk of loss to the owner's insurance company, meaningless.

¶ 104    The plaintiffs do not cite to any Illinois authority to the contrary. Instead they rely on *Liberty Mutual Insurance Co. v. Perfect Knowledge, Inc.*, 752 N.Y.S.2d 677 (App. Div. 2002), a case decided by the New York appellate court. In light of already existing Illinois precedent to the contrary discussed above, we need not, however, consider that decision as it is not binding upon this court. See, *e.g.*, *In re M.H.*, 2011 IL App (1st) 110196, ¶ 58 ("this court is not bound by decisions from other jurisdictions").

¶ 105                              E. Empress's Deductibles

¶ 106    Lastly, on appeal, Empress alone asserts that it never waived its right to recover its deductibles under its general property insurance policies with National Fire and Lloyd's. Specifically, Empress asserts that the language of the construction contract requiring it to pay deductibles only applies to its builder's risk policy with Axis. In that respect, Empress concedes that the language of section 11.4.1.3 states that "if the *property insurance* requires deductibles," Empress will pay "costs not covered because of such deductibles." Nonetheless, Empress contends that because section 11.4.1.3 is part and parcel of section 11.4, requiring Empress to obtain the builder's risk insurance, this section does not apply to Empress's policies with National Fire and Lloyd's, which were obtained long before the parties entered into the construction contract. We disagree.

¶ 107    While it is true that section 11.4.1.3 is part of section 11.4 of the construction contract, the plain language of that section does not limit the deductible requirement to the builder's insurance but rather speaks of "property insurance" in general. Contrary to Empress's interpretation, the term "property insurance" is used interchangeably in the entirety of section 11.4, obligating Empress to maintain "property insurance," and at different times connotes both builder's risk and general property insurance. See *supra* ¶ 15. At those instances where the parties intended to differentiate between the types of property insurance used, they clearly do so. As already discussed above, section 11.4.5 of the construction contract explicitly

permits Empress to use its general "property insurance" to insure its property (at or adjacent to the construction site) for losses resulting from a fire and obligates Empress to waive its subrogation rights with respect to those policies. Under such a requirement, it makes no sense to permit Empress to avoid its deductibles on such property insurance. Accordingly, since nothing in the plain language of section 11.4.1.3 indicates a limitation of the deductible requirement to the builder's risk policy, we conclude that Empress is responsible for its deductibles to National Fire and Lloyd's.

¶ 108                          III. CONCLUSION

¶ 109      For the reasons that follow, we affirm in part the judgment of the circuit court granting summary judgment to all of the defendants on all claims, except for those involving the defendant, Averus. We reverse in part that portion of the trial court order with respect to Averus and remand for further proceedings against that defendant.

¶ 110      Affirmed in part; reversed and remanded in part.